Good morning, Your Honors. Good morning. May it please the Court, my name is Alex Lubarsky. I'm here on behalf of Petitioner Fabio Davila. I would like to request two minutes rebuttal time. Mr. Davila, the petitioner, is a 41-year-old native of Nicaragua. I'm going to spend a little bit of time discussing the procedural aspects of this case because I believe that all of our points in contention here on appeal relate directly to procedural matters as they were handled by the immigration judge rather than pure factual matters. My client is a 41-year-old native of Nicaragua. He's resided continuously in the United States since 1988. He has two citizen children, both serving in the United States military. He has a U.S. citizen spouse. He entered the United States in 88, left, went back to Nicaragua in 94, adjusted his status to his spouse, came back with a green card. In 1997, he suffered a domestic violence conviction and was placed into removal proceedings. In 1998, he was able to expunge, pursuant to California 1203.4, his conviction and present it to the immigration court, showing that it was expunged and it shouldn't be considered a conviction for immigration purposes. The judge didn't rule on his motion to terminate but pushed the case out until 1999. And in the interim, between the next hearing and his presentation of the 1203.4 expungement, the law changed and the decision to rule Dan came down, basically eliminating expungements as a vehicle to eliminate the definition of conviction as it pertains to immigration law. Therefore, the judge ultimately refused to give any weight to his expungement. Therefore, based on that, the judge pre-terminated essentially all forms of relief. A respondent had filed an adjustment of status application to his spouse. He filed his 212H waiver. He had asked to have his matter administratively closed to pursue special rule adjustment through the Nicaraguan and Central American Relief Act. And the case went on for seven years before the immigration judge. And at the end of the day, all of his efforts were stricken down or denied by the judge. And ultimately, the judge, in this matter, ruled on, didn't allow him to present any relief. Pre-terminated all applications. And in her decision, the judge said, look, this is a really complicated case. We have a lot of issues going on. The laws have changed. The rules have changed. At one point, towards the very end of the seven-year period, a respondent actually would be offended and could pick up another crime. And the judge said in her decision, I'm going to rely on the BIA to sort this all out. And that's in the administrative record. The BIA took the case and issued a verbano affirmance. It didn't really treat the matter, offered no reasoning or opinion, simply verbatim upheld or repeated, parroted the decision of the immigration judge, which is a bit illogical in our view because the immigration judge was specifically hoping that the board would step in and resolve some of these issues, but the board simply issued a verbano opinion. So the first issue that we bring up is the issue concerning the verbano affirmance in and of itself. And, again, we believe that because the immigration judge was relying on the board, as I said earlier, to examine and provide some type of guidance or some type of reasoning for appellate's arguments, it simply issued verbano decision. Secondly, we believe that the expungement, the immigration judge's refusal to consider the expungement, even though the crime was committed, when expungements were still valid as far as presenting them to minimize immigration consequences, the expungement was granted during that period of time. And it was presented to the court during that period of time. We believe that petitioner's due process rights were violated when, after the law changed, the judge finally decided to rule on that issue and said it's no longer an issue before this court because of the Roldan decision. Finally, we would like to point out that we think that some of the issues concerning retroactivity and fundamental fairness that the Supreme Court has seen in the St. Cyr matters and the Landgraf matters, they all essentially say the same thing, that a petitioner is entitled to take advantage of the rule of law as it pertains at the time an act or a decision is ‑‑ excuse me, an act or a ruling is rendered. In this situation, again, Respondent's criminal conviction and his expungement were all obtained while pre‑Roldan and while expungements were commonly used in immigration court to mitigate the effects of a criminal conviction. So we feel that there's a due process violation because Respondent, or petitioner in this matter, relied on that rule of law. For what? For the expungement. He relied on that rule. What did he rely on it for? He relied on the ability to obtain a California 1203.4 expungement so that he would ‑‑ I mean, he didn't plead guilty, for example, as in St. Cyr, relying upon the state of the law as it was the time he did something. Correct. What did he rely on it for? I understand the question. You're correct in that he did not rely on the expungement at the time he pled to the case. But he did subsequently rely on the fact that he could obtain an expungement so that he would be cancellation eligible, so that he would be adjustment eligible. You mean he wouldn't have gotten the expungement if he weren't about to be sent out of the country? Yeah. Actually, the advice of my office, who was representing him before removal proceedings, we advised him, look, you know, the judge is not going to allow you to continue with your form of relief unless we can expunge this crime. You're allowed to do it under California law. Let's get it expunged. We sent him to a criminal specialist who got the case expunged. Okay. Well, we're here now. What relief do you ‑‑ are you seeking exactly, and what authority supports it? Well, we believe this matter should be, first of all, be remanded to the board, because there are so many issues at stake. Well, what gives you ‑‑ why? Well, and I'm going to get into some of the other issues. We believe that, for example, respondent was, in our view, prima facie cancellation ‑‑ I'm sorry, prima facie adjustment eligible. He had a U.S. citizen spouse, had an I-130 that was previously approved from his first visit back to Nicaragua when he got his green card. He actually reapplied for another I-130 to attempt a readjustment of status. With that expungement, he would have been cancellation eligible at the time he submitted his cancellation application. Didn't the judge also rely on the second conviction? Well, the second conviction came out at the very, very tail end of this year. As I said, this matter was before the court for seven years, 97 to 2004. The second conviction, which was a game changer, did take place in 2004. But all of these denials on the part of the immigration judges, the refusal to allow a continuance for the second I-130 to be adjudicated, the refusal to give any weight to the 1203.4 expungement, all of these decisions came out far prior to the second conviction. Well, don't they become somewhat academic once you have the second conviction and reliance on that conviction as a basis for denying relief? Well, possibly. There's two points there. First of all, had the judge appropriately ruled at the time that we feel she should have ruled, Respondent would have had, would not have, would have won his relief or would have been granted relief and then probably would have suffered the second conviction. He wouldn't have had the conviction at that time? Well, he might have had. He would have been, the case would have been closed. These cases normally go for a year to two years. This case went for seven years. I've never, in my personal experience, never seen anything quite like it. It should have been adjudicated within a few years, far before the second conviction was obtained, and it would have been a different situation. He would have been granted relief and if he had to go back to court with another, he could have actually, technically he could have already been, he would have probably been a U.S. citizen by the time the second conviction happened and he would never find himself in removal proceedings again. So the timing is substantial. I mean, it is something that I believe needs to be. Your only issue then is the length of time it took the board to decide, or the I.J. to decide the case. Well, there's another issue that I was going to get to concerning the second conviction. Even assuming the second conviction happened immediately after the first conviction, we think that 1203.4 should have been, should have been honored by the court, should not have been pre-terminated, and that would have expunged the first conviction. That would have left him with only one second conviction, and that second conviction arguably would have fallen under the petty offense exception or would have fallen under, or would have been waivable through a 212H, something of that nature. So there's that as well. Our next point of contention is that we believe that the I-130 petition, the second I-130 petition, the judge essentially continuously refused to grant continuances. Okay. We understand your position on that. It's well briefed and you've used your time. Thank you very much.  May it please the Court. Rebecca Hoffberg on behalf of the Respondent, the United States Attorney General. The Petitioner in this case sought several forms of relief from removal. However, the immigration judge and subsequently the board correctly found that he was and remains statutorily ineligible for all of them. As a matter, as a preliminary matter, he waived many of the issues by not raising them in his opening brief. He did not, for example, he did not specifically challenge the ineligibility for the 212H waiver. He did not challenge the ineligibility for the 240A cancellation of removal eligibility. And he never, sorry, and he didn't, so he abandoned these claims. I'm trying to see if he waived anything else. And he basically sort of ignored the whole 2002 conviction entirely in his brief. I mean, it's not really mentioned at all as if that has no bearing. And, of course, it would have no bearing on the charge of removability because it occurred after the NTA was issued. But it certainly has bearing on his eligibility for relief now because regardless of what happened with the 97 conviction, which I will address definitely in detail in a moment, that 2002 conviction now stands that makes him inadmissible. You really have to go beyond that? Well, I mean, I think it's worth noting that these proceedings were valid and they should never have been terminated, that this conviction was always a conviction. He was convicted before the definition, I'm sorry, while the definition of conviction under 101A48 was already in place. That definition came into effect September 30th, 1996. He was convicted in January 1997. So regardless of whether Matter of Roldan had interpreted that definition yet, that definition of conviction was in place. And that definition makes clear that it applies to situations where guilt is withheld. And so what happened in this case, and this is from my understanding of the record, that the government was aware that he had these convictions and unfortunately, very unfortunately, could not get its hands on the right criminal records in time. And so you'll notice the first notice to appear has his original date of entered without admission in 1988. And that date is the correct date. It just didn't have the correct nationality and didn't list his crime. There must have been some confusion on that. But the government knew enough that he had a criminal history because the first time he tried to terminate his proceedings, the government said you're not going to be eligible for NACARA because you're inadmissible for CIMT. And the government recognized that. The government just had trouble getting its hands on these conviction records. And once it did, it went ahead and amended the NTA. And that's why the judge, in all fairness to the petitioner, said let's go with the amended NTA as the date that we stop the clock on this accrual time because the government didn't have its act together. The government admitted on the record this was handled inefficiently. The judge recognized it. Everybody recognized it. And the judge said, well, you know what? I give many chances to the petitioners who come in and need more time for applications and need more time to collect their witnesses and information. And the judge said, in all fairness to the government, they should be allowed to get the time to get these criminal convictions. And the judge stated this on the record. It's around page 67 to 70 in the hearing. And she recognized that more time was needed. The other reason why more time took place in this case is because the judge realized that the law was in transition and the judge recognized that this court might change the matter of Roldan. And, therefore, she waited a year because she thought, well, let's see what happens in the law. She did it to the advantage of the petitioner because the matter of Roldan was there. And she thought, well, the Ninth Circuit is going to review this. Let's give this another year. And that's why the next hearing didn't happen until 2000. And by that time, the petitioner benefited from the wait. His wife naturalized in 2000. He wasn't eligible to adjust his status for a U.S. citizen wife until she naturalized. So to say that this went on and on and on and he was poorly disadvantaged is not true because the law actually was developing and the judge was trying to give him the benefit of the doubt and say, let's see what the law does. And then Lujan came out and the judge specifically recognized, okay, the Ninth Circuit has weighed in on this. And what they found is under the Equal Protection Clause, the first Federal Offender Act is what is the distinguishing factor here. The Ninth Circuit said we can't allow someone who would be expunged under federal law to not be expunged under state law for immigration purposes. And this Court cut out a very limited exception in Lujan, which has not been followed by any of the other circuit courts, but that has been followed in this Court, and that this Court has specifically rejected applying Lujan outside of that Federal First Defender Act context. So you have Ramirez. Kagan. So does the record give any indication of any basis for relief for the petitioner? No.  And it is unfortunate, as the judge noted, at first the court said. I don't think you oughtn't to try to argue yourself out of that. I'm sorry. What did you say? I said maybe you oughtn't to try to argue yourself out of that inescapable conclusion, as Judge Schroeder just stated it. Yes. And it is. I mean, I think the judge was trying to be as fair as she possibly could be in this case. And she was going through. She even hypothetically did a 212c. He didn't even apply for 212c. I don't think you need to say that. Okay. Are there any further questions? Okay. Thank you. You've used your time. Yes, you have. The case just argued is submitted.
judges: Schroeder, Reinhardt, Rymer